HANNA MINING CO. ET AL. *v.* DISTRICT 2,
MARINE ENGINEERS BENEFICIAL
ASSOCIATION, AFL–CIO, ET AL.

No. 7. Argued October 12, 1965.—Decided December 6, 1965.

182

*John H. Hanninen* argued the cause for petitioners. With him on the brief was *Lucian Y. Ray.*

*Lee Pressman* argued the cause for respondents. With him on the brief was *David Scribner.*

*Acting Solicitor General Spritzer, Arnold Ordman, Dominick L. Manoli, Norton J. Come* and *Laurence S. Gold* filed a brief for the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The present controversy once again brings before the Court the troublesome question of where lies the line between permissible and federally preempted state regulation of union activities.

## I.

Petitioners ("Hanna") are four corporations whose integrated fleet of Great Lakes vessels carries cargo in interstate and foreign commerce and is operated by one of the four, the Hanna Mining Company. The respondent District 2, Marine Engineers Beneficial Association ("MEBA")[1] represented the licensed marine engineers in Hanna's fleet under a collective bargaining agreement

---

[1] The remaining respondents are officers, agents, and representatives of MEBA, and what is said of it in this opinion applies equally to them.

terminating on July 15, 1962. According to Hanna, while negotiations for a new contract continued during August 1962, a majority of the marine engineers informed Hanna by written petitions that they did not wish to be represented by MEBA. Hanna then declined to negotiate further until MEBA's majority status was established by a secret ballot. Without acquiescing in this proposal or questioning any of the employee signatures on the petitions, MEBA responded on September 12, 1962, by picketing one of Hanna's ships unloading at a dock in Duluth, Minnesota, with signs giving the ship's name, stating that Hanna unfairly refused to negotiate with MEBA, and indicating that no dispute existed with any other employer. Because of the continued picketing, dock workers refused day after day to unload the ship. From September 12 until shipping ended for the winter, MEBA similarly picketed Hanna ships at other Great Lakes ports, including Superior, Wisconsin.

Hanna turned first to the National Labor Relations Board. On September 12, it petitioned the Regional Director at Cleveland, Ohio, to hold a representation election among Hanna's engineers to prove or disprove MEBA's majority status. The petition was dismissed at the end of September on the stated ground that the engineers were "supervisors" under § 2 (11) of the National Labor Relations Act,[2] and automatically excluded from the Act's definition of "employees" under § 2 (3),[3] so election proceedings under § 9 were not warranted;[4] giv-

---

[2] National Labor Relations Act, as amended, § 2 (11), 61 Stat. 138, 29 U. S. C. § 152 (11) (1964 ed.), gives a functional definition of the term "supervisor."

[3] National Labor Relations Act, as amended, § 2 (3), 61 Stat. 137, 29 U. S. C. § 152 (3) (1964 ed.), provides in relevant part that the "term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . ."

[4] National Labor Relations Act, as amended, § 9, 61 Stat. 143, 29 U. S. C. § 159 (1964 ed.), pertinently provides in subsection (c) that petitions may be entertained and elections ordered to deter-

ing the same reason, the Board in November declined to overturn this decision.[5]   As a second measure, Hanna on September 15, 1962, filed charges with the Regional Director in Minneapolis, Minnesota, alleging that MEBA had violated § 8 (b)(4)(B) of the Act,[6] by inducing work stoppages among dockers at Duluth through improper secondary pressure.   In October, the Regional Director dismissed the charges and the General Counsel sustained the dismissal in December, stating that MEBA's conduct

mine "the representative defined in subsection (a) of this section"; and subsection (a) pertinently provides that "[r]epresentatives designated or selected . . . by the majority of the employees in a unit . . . shall be the exclusive representatives of all the employees in such unit" for collective bargaining purposes.

[5] In relevant part the Board's letter stated that as the "appeal makes no affirmative claim that a majority of the 'employees' as distinguished from 'supervisors' are sought to be represented in an appropriate unit and as a unit of supervisors is otherwise inappropriate, no question concerning representation in an appropriate unit exists."   While this pronouncement could be clearer, the parties do not dispute that it affirms or refuses to disturb the Regional Director's explicit finding.

[6] National Labor Relations Act, as amended, § 8 (b)(4)(B), 73 Stat. 542, 29 U. S. C. § 158 (b)(4)(B) (1964 ed.), provides in relevant part that it shall be an unfair labor practice for a labor organization or its agents:

"(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to . . . transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services . . . where . . . an object thereof is—

·       ·       ·       ·       ·

"(B) forcing or requiring any person to cease . . . handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless . . . certified . . . .   *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

at Duluth and at other sites investigated did not exceed the bounds of lawful picketing under the Board's standards.[7] Hanna's third and last appeal to the Board came on September 27, 1962, when it filed charges with the Regional Director in Cleveland, Ohio, accusing MEBA of organizational or recognitional picketing improper under § 8 (b)(7) of the Act.[8] The Regional Director dismissed the charge in October and in the next two months the General Counsel affirmed the dismissal because in seeking to represent "supervisors" rather than "employees" MEBA fell outside the section.[9]

Winter brought an end to both shipping and picketing for several months but when the navigation season opened in the spring of 1963 MEBA pickets once more appeared. After picketing occurred at Superior, Wisconsin, Hanna filed suit on June 24, 1963, in a Wisconsin circuit court. The complaint and affidavits alleged that MEBA was picketing Hanna's vessels at the docks of the Great Northern Railway Company at Superior in the

---

[7] The letter from the General Counsel's office stated in part: "[T]he evidence revealed that the picketing by MEBA at the common situs herein conformed to Moore Dry Dock standards . . . . Furthermore, MEBA's activity at other sites did not evince an unlawful object on the part of the Union inconsistent with the ostensibly primary object of the picketing at the situs of the dispute."

[8] National Labor Relations Act, as amended, § 8 (b)(7), 73 Stat. 544, 29 U. S. C. § 158 (b)(7) (1964 ed.), provides, excluding portions and exceptions not here relevant, that it is an unfair labor practice for a labor organization or its agents to picket any employer with an object of forcing "an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization" as their bargaining agent unless such labor organization is certified or seeks certification.

[9] A second, clarifying letter from the General Counsel's office stated in part: "Our disposition of this case was predicated solely on our conclusion that the supervisory status of the licensed engineers precluded a finding that the Union's picketing and other activity was for an object proscribed by Section 8 (b)(7) of the Act."

same manner as the 1962 picketing and with the same improper aim of forcing its representation on unwilling engineers; Hanna stated that workers of other employers were refusing to render service to Hanna's vessels and it prayed for injunctive relief against further picketing of the vessels and the docks where they berthed and against any other attempt of MEBA to impose representation on Hanna engineers. The Circuit Court dismissed the suit in July for lack of jurisdiction over the subject matter. In April 1964 the Wisconsin Supreme Court affirmed the decision. 23 Wis. 2d 433, 127 N. W. 2d 393. While agreeing that the picketing could be deemed illegal under Wisconsin law,[10] that court held that the picketing arguably violated §§ 8 (b)(4)(B) and 8 (b)(7) of the federal labor Act and so fell within the Board's exclusive jurisdiction marked out in *San Diego Unions* v. *Garmon,* 359 U. S. 236. In light of other language in *Garmon* the Wisconsin Supreme Court held that the General Counsel's dismissal of charges under §§ 8 (b)(4)(B) and 8 (b)(7) did not foreclose the possibility of a preempting violation, even assuming the 1963 picketing in Superior mirrored the 1962 picketing in Duluth. We invited the views of the United States, 379 U. S. 942, granted certiorari, 380 U. S. 941, and now reverse and remand.

## II.

The ground rules for preemption in labor law, emerging from our *Garmon* decision, should first be briefly summarized: in general, a State may not regulate conduct arguably "protected by § 7, or prohibited by § 8" of the National Labor Relations Act, see 359 U. S., at 244–246; and the legislative purpose may further dictate that certain activity "neither protected nor prohibited" be deemed privileged against state regulation, cf. 359

---

[10] See *Vogt, Inc.* v. *International Brotherhood,* 270 Wis. 321a, 74 N. W. 2d 749, aff'd *sub nom. Teamsters Union* v. *Vogt, Inc.,* 354 U. S. 284.

U. S., at 245. For the reasons that follow, we believe the Board's decision that Hanna engineers are supervisors removes from this case most of the opportunities for preemption.

When in 1947 the National Labor Relations Act was amended to exclude supervisory workers from the critical definition of "employees," § 2 (3), it followed that many provisions of the Act employing that pivotal term would cease to operate where supervisors were the focus of concern. Most obviously, § 7 no longer bestows upon supervisory employees the rights to engage in self-organization, collective bargaining, and other concerted activities [11] under the umbrella of § 8 of the Act, as amended, 61 Stat. 140, 29 U. S. C. § 158 (1964 ed.). See *Labor Board* v. *Budd Mfg. Co.*, 169 F. 2d 571. Accordingly, activity designed to secure organization or recognition of supervisors cannot be protected by § 7 of the Act, arguably or otherwise. Compare *Labor Board* v. *Drivers Local Union*, 362 U. S. 274, 279. Correspondingly, the situations in which that same activity can be prohibited by the Act, even arguably, are fewer than would be the case if employees were being organized or seeking recognition. There can be no breach of § 8 (b)(7), curtailing organizational or recognitional picketing, because there cannot exist the forbidden objective of requiring representation of "employees" by the picketing organization. Nor could one even advance the argument unsuccessfully urged in *Drivers Local Union* that § 8 (b) (1)(A), 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(A) (1964 ed.), condemns the picketing as restraint or coercion of employees exercising their § 7 right *not* to organize or bargain collectively.

---

[11] National Labor Relations Act, as amended, § 7, 61 Stat. 140, 29 U. S. C. § 157 (1964 ed.), provides that "employees" shall have the right to engage in, or in general to refrain from, the mentioned activities.

Even though such efforts to unionize supervisors are not protected by the Act, or in the respects immediately relevant prohibited by it, the question arises whether Congress nonetheless desired that in their peaceful facets these efforts remain free from state regulation as well as Board authority. Compare *Teamsters Union* v. *Morton,* 377 U. S. 252, 258–260. Arguing that the States are indeed powerless in this respect, MEBA pitches its case chiefly on the 1947 amendment of the "employee" definition and on the concurrent enactment of § 14 (a) of the Act, 61 Stat. 151, 29 U. S. C. § 164 (a) (1964 ed.), which provides in relevant part that "[n]othing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization . . . ." It is contended that the amendment and this section signify a federal policy of *laissez faire* toward supervisors ousting state as well as Board authority and, more particularly, that to allow the Wisconsin injunction would obliterate the opportunity for supervisor unions that Congress expressly reserved.

This broad argument fails utterly in light of the legislative history, for the Committee reports reveal that Congress' propelling intention was to relieve employers from any compulsion under the Act and under state law to countenance or bargain with any union of supervisory employees.[12] Whether the legislators fully realized that their method of achieving this result incidentally freed supervisors' unions from certain limitations under the

---

[12] Summarizing the impact of the new measure on supervisory personnel, the Senate Report stated: "[T]he bill does not prevent anyone from organizing nor does it prohibit any employer from recognizing a union of foremen. It merely relieves employers who are subject to the national act free from any compulsion by this National Board or any local agency to accord to the front line of management the anomalous status of employees." S. Rep. No. 105, 80th Cong., 1st Sess., p. 5. See also H. R. Rep. No. 245, 80th Cong., 1st Sess., pp. 13–17.

newly enacted § 8 (b) is not wholly clear, but certainly Congress made no considered decision generally to exclude state limitations on supervisory organizing. As to the portion of § 14 (a) quoted above, some legislative history suggests that it was not meant to immunize any conduct at all but only to make it "clear that the amendments to the act do not prohibit supervisors from joining unions . . . ." S. Rep. No. 105, 80th Cong., 1st Sess., p. 28; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., p. 60 ("[T]he first part of this provision [§ 14 (a)] was included presumably out of an abundance of caution."). However, even assuming that § 14 (a) itself intended also to make it clear that state law could not prohibit supervisors from joining unions, the section would have no application to the present facts; for picketing by a minority union to extract recognition by force of such pressures is decidedly not a *sine qua non* of collective bargaining, as indeed its limitation by § 8 (b)(7) in nonsupervisor situations attests.

The remaining question in this phase of the case is whether the supervisory status of Hanna's engineers has been settled "with unclouded legal significance," *Garmon,* 359 U. S., at 246, so as to preclude arguable application of the Act in the respects discussed. We hold that the Board's statement accompanying its refusal to order a representation election does resolve the question with the clarity necessary to avoid preemption. While MEBA does not contend that the Board erred in its determination, an abstract difficulty arises from the lack of a statutory channel for judicial review of such a Board decision. Compare *Hotel Employees* v. *Leedom,* 358 U. S. 99 (equity action to obtain election). However, the usual deference to Board expertise in applying statutory terms to particular facts assures that its decision would in any event be respected in a high percentage of instances, and so diminished a risk of interference with

federal labor policy does not justify use of the pre-emption doctrine to thwart state regulation bound to be legitimate on this score in almost all cases.

## III.

A further basis for preemption, urged by MEBA and adopted by the Wisconsin Supreme Court, is that the picketing at Superior exerted secondary pressure arguably violating § 8 (b)(4)(B). The argument appears to be that a state injunction banishing the pickets inevitably impinges upon the Board's authority to regulate facets of the picketing that might exceed "primary" picketing and violate § 8 (b)(4)(B)[13]—facets never specified by MEBA but presumably those that ignore the Board's limitations on time, location, and manner of common situs picketing. See *Sailors' Union of the Pacific* (*Moore Dry Dock*), 92 N. L. R. B. 547. However, as will appear, no arguable violation exists if Hanna's proof lives up to its allegations; further, even assuming a violation, federal interests normally justifying preemption are absent from this case.

Hanna's claim that there is no arguable violation rests, of course, on the finding made by the Regional Director and the General Counsel in declining to issue a complaint under § 8 (b)(4)(B) with respect to MEBA's 1962 picketing. The Wisconsin Supreme Court refused to credit this finding because of this Court's comment in *Garmon* that the "refusal of the General Counsel to file a charge" is one of those dispositions "which does not define the nature of the activity with unclouded legal significance." 359 U. S., at 245–246. This language allows

---

[13] By contrast, sometimes offensive conduct may be restrained by a state remedy that has no impact at all on related activity arguably within the Board's exclusive province. See, *e. g., Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131, upholding a state injunction against violence but setting it aside so far as it reached peaceful picketing.

more than one interpretation, but we take it not to apply to those refusals of the General Counsel which are illuminated by explanations that do squarely define the nature of the activity. The General Counsel has statutory "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints," § 3 (d) of the Act, as amended, 61 Stat. 139, 29 U. S. C. § 153 (d) (1964 ed.), and his pronouncements in this context are entitled to great weight. The usual inability of the charging party to contest the General Counsel's adverse decision in the courts, see *Hourihan* v. *Labor Board,* 91 U. S. App. D. C. 316, 201 F. 2d 187, does to be sure create a slight risk if state courts may proceed on this basis, but in the context of this case we believe the risk is too minimal to deserve recognition.

Even taking the General Counsel's ruling at face value, MEBA stresses that the § 8 (b)(4)(B) charge by Hanna concerned picketing in Duluth in September 1962 while the picketing before the Wisconsin court occurred at Superior in spring 1963. Yet Hanna accompanied the 1962 charge with information as to the 1962 picketing in several ports including Superior. The Regional Director is said to have conducted an investigation in Superior as well as in Duluth, and the General Counsel's letter on the § 8 (b)(4)(B) charge appeared to state that activity at the sites other than Duluth also did not violate the Act. See n. 7, *supra.* And while some months intervened between the fall 1962 picketing at Superior and its resumption at that port in spring 1963, Hanna has offered to prove that the picketing remained the same in all significant respects including the picket signs employed, the location of the pickets, and the pickets' general behavior. If this proof is furnished, the chance that the picketing sought to be enjoined conceals a § 8 (b)(4)(B) violation seems remote indeed.

Additionally, even if a § 8 (b)(4)(B) violation were present, central interests served by the *Garmon* doctrine

are not endangered by a state injunction when, in an instance such as this, the Board has established that the workers sought to be organized are outside the regime of the Act. Cf. *Incres S. S. Co.* v. *Maritime Workers,* 372 U. S. 24. Most importantly, the Board's decision on the supervisory question determines, as we have already shown, that none of the conduct is arguably protected nor does it fall in some middle range impliedly withdrawn from state control.[14] Consequently, there is wholly absent the greatest threat against which the *Garmon* doctrine guards, a State's prohibition of activity that the Act indicates must remain unhampered.[15]

---

[14] Aside from the §14 (a) line of argument already answered, we do not find at all apposite *Teamsters Union* v. *Morton,* 377 U. S. 252, holding a State powerless to award damages against a striking union for requesting a secondary employer to cease business with the struck employer. While in *Morton* preemption was premised on the fact that the secondary pressure did not come within the ban fixed by § 8 (b) (4) (B) and adopted by § 303 (a) of the Labor Management Relations Act, as amended, 73 Stat. 545, 29 U. S. C. § 187 (a) (1964 ed.), the conduct there occurred in the context of a peaceful economic strike by employees, a sphere in which the federal interest is especially pervasive. By contrast the present case, involving secondary pressure wielded to impose representation on unwilling supervisors, finds itself at that far corner of labor law where, as we have shown, federal occupation is at a minimum and state power at a peak.

[15] *Hattiesburg Unions* v. *Broome Co.,* 377 U. S. 126, cited to us by MEBA, may illustrate this concern. There, the union's organizational picketing at a common situs was enjoined by the State because its objective violated state law. In urging that the picketing's possible violation of § 8 (b) (4) (B) preempted state authority, the Solicitor General suggested that it may also have been "lawful picketing" outside the State's reach so far as not prohibited by the section. Memorandum, p. 6, n. 7. See also Michelman, State Power To Govern Concerted Employee Activities, 74 Harv. L. Rev. 641, 652–653 (1961) (citations omitted): "[A] state generally may not enjoin conduct thought to be a federal unfair labor practice. The reason is that, despite the state court's contrary belief, the conduct may, as a matter of federal law, be privileged."

Nor is this a case in which the presence of arguably prohibited activity may permit the Board to afford complete protection to the legitimate interests advanced by the State. Since Hanna as the primary employer is present at the picketed situs, the primary picketing proviso of § 8 (b)(4)(B) severely inhibits the Board's use of that section to reach the volatile core of the conduct, the impact on secondary employers that follows from the mere presence of the pickets at a common situs. Section 8 (b)(7) which might provide full relief is rendered inapplicable by the supervisor ruling. Thus, so far as *Garmon* may proceed on the view that the opportunity belongs to the Board wherever it and the State offer duplicate relief, it has limited application to the present facts.[16]

In concluding that the Act does not preempt the State's authority to quench the picketing said to have occurred in this case, we do not retreat from *Garmon*. Rather, we consider that neither the terms nor the policies of that decision justify its extension to the present facts, an extension producing untoward results noted by the Wisconsin Supreme Court itself. 23 Wis. 2d 433, 446, 127 N. W. 2d 393, 399.

The judgment of the Supreme Court of Wisconsin is reversed and the case is remanded to that court for proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[16] In *Marine Engineers* v. *Interlake Co.*, 370 U. S. 173, we overturned a state ban on picketing arguably violating § 8 (b)(4)(B); and to the counterargument that the picketing group was not a "labor organization" subject to § 8 (b), we pointed out that this decision was for the Board. Unlike the present case, in *Interlake* the § 8 (b) (4)(B) remedy had not been tried; but quite apart from that consideration, had the Board held the union a "labor organization" and also held those being organized to be "employees"—another point not recently decided by the Board—complete relief against the picketing might well have been available under § 8 (b)(7). See 370 U. S., at 182–183.

MR. JUSTICE BRENNAN, concurring.

I agree with the Court that § 14 (a) does not evince a congressional decision to exclude state regulation of picketing aimed at organizing supervisors and securing the employer's recognition of the union. The question here, however, is whether Congress has excluded state regulation when that picketing also has secondary aspects arguably within the reach of § 8 (b)(4)(B). I agree with the Court that state regulation is likewise not precluded in such case.

The proviso to § 8 (b)(4)(B) expressly states "[t]hat nothing contained in this clause (B) shall be construed to make unlawful, *where not otherwise unlawful,* any primary strike or primary picketing." (Emphasis supplied.) While Congress thus provided that primary picketing is not rendered unlawful under the Act merely by having secondary aspects, the italicized words of the proviso evince a congressional intention to leave undisturbed whatever other provisions of law regulate primary picketing. Ordinarily such regulation occurs under the National Labor Relations Act. The primary aspects of supervisory picketing are not, however, regulated by the federal Act; and I think the assumption that regulation will occur, which underlies the italicized words of the proviso, is strong enough to support the Court's conclusion that state regulation of supervisory organizational picketing is not preempted.*

It is true that we said in *Garmon* that States have no power to regulate "activities" arguably subject to the federal Act; picketing which, because of its secondary aspects, is arguably subject to § 8 (b)(4)(B) is, by one construction, an "activity." But *Garmon* was not a case in which only incidental aspects of picketing were argu-

---

*It could be argued that this assumption supports a scope of state regulation no broader than that ordinarily provided by the federal Act. It is not necessary to resolve that argument here.

ably subject to federal power and in which the alternative to state regulation was a regulatory void which Congress plainly assumed would not exist. In this limited context, it is permissible to distinguish the primary from the secondary aspects of the picketing, and hold that the States may regulate the former, although preempted as to the latter, and although the necessary effect of regulation curbs both secondary and primary aspects of the picketing. This choice seems more consistent with the congressional meaning, since the alternative is to immunize the primary aspects of such common-situs picketing from state regulation, and that alternative finds no support either in policy or in the statute. Thus, I think that the Wisconsin courts may consider so much of the complaint as is addressed to the primary aspects of MEBA's picketing.