In the Matter of the Arbitrations Between GLOBE SEAWAYS, INC. and NATIONAL MARINE ENGINEERS' BENEFICIAL ASS'N, and Sea Liberties, Inc. and National Marine Engineers' Beneficial Ass'n.

NATIONAL MARINE ENGINEERS' BENEFICIAL ASS'N, Appellant,

v.

GLOBE SEAWAYS, INC. and Sea Liberties, Inc., Appellees.

No. 68, Docket 71–1302.

United States Court of Appeals, Second Circuit.

Argued Oct. 5, 1971.

Decided Dec. 15, 1971.

Joel C. Glanstein, New York City (Donald E. Klein, Steven Thaler, Scribner, Glanstein & Klein, New York City, on the brief), for appellant.

Martin C. Seham, New York City (Fred C. Klein, Susan Powers, Surrey,

Karasik, Greene & Seham, New York City, on the brief), for appellees.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

HAYS, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York denying appellant's motion to confirm a series of arbitration awards.

The issue here is whether the parties had a valid agreement to arbitrate at the time the dispute arose; if there was no such agreement, appellees were under no obligation to arbitrate, and the awards against them cannot stand. See Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 312 F.2d 181 (2d Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963).

The National Marine Engineers' Beneficial Association (MEBA) represents licensed engineers on ships owned by appellees.[1] Appellees are related corporations. Globe Seaways, Inc. owns one tanker and Sea Liberties, Inc. owns one dry cargo vessel. Globe Seaways and Sea Liberties are members of the American Maritime Association (AMA), a trade association, which represents its members in collective bargaining.

Globe Seaways and Sea Liberties were parties to similar collective bargaining agreements with MEBA that expired on June 15, 1969. These agreements included a no-strike clause and an agreement to settle all disputes by a two-step grievance procedure, the second step of which was arbitration. In the case of Sea Liberties, the dry cargo owner, AMA,[2] on the company's behalf, and the union executed, on June 6, 1969, a "Memorandum of Understanding"[3] by which they extended the existing agreement temporarily. The company undertook to agree to new terms that might thereafter "be agreed upon between the Union and the major subsidized dry cargo companies operating on the Atlantic and Gulf Coasts as a result of their negotiations for a new contract. The effective date of said new terms and conditions shall be as of June 16, 1969 . . .." The Memorandum also

---

1. For purposes of this litigation, at least, MEBA is not a labor organization under the National Labor Relations Act section 2, 29 U.S.C. § 152 (1970). Appellee Globe Seaways filed complaints of unfair labor practices against MEBA in the course of the dispute that led to this lawsuit; the NLRB's regional office, on October 13, 1969, refused to issue a complaint or notice of hearing on the ground that the members involved were supervisors rather than employees.

In 1960 this court upheld a Board finding that MEBA was a labor organization. National Marine Engineers Beneficial Ass'n v. NLRB, 274 F.2d 167, 175 (2d Cir. 1960). On the other hand, the Supreme Court later accepted as conclusive a Board ruling that MEBA was not a labor organization within the meaning of the Act since it represented only supervisors. Hanna Mining Co. v. District 2, Marine Engineers Beneficial Ass'n, 382 U.S. 181, 190, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965). We find no reason to reject the conclusion of the NLRB in the instant case that MEBA is not a labor organization.

The case of A. H. Bull Steamship Co. v. National Marine Engineers Beneficial Association, 250 F.2d 332 (2d Cir. 1957), suggested that there was some question as to jurisdiction under Section 301 of the Labor Management Relations Act with respect to organizations representing supervisors. This question has since been resolved in favor of such jurisdiction. See United States v. National Marine Engineers Beneficial Association, 294 F.2d 385 (2d Cir. 1961). See also the exhaustive treatment of this issue in Judge Zavatt's opinion in Isbrandtsen Co. v. District 2, Marine Engineers Beneficial Association, 256 F.Supp. 68 (E.D.N.Y. 1966).

2. There is some dispute among the parties as to whether AMA's signature would be sufficient to bind its individual member companies. In the view we take of this case, we can assume, without deciding, that it would be.

3. This document was not before the district court; it was stipulated into the record after the decision there.

contained the following termination clause:

"Prior to the actual execution by both Parties hereto of a written Memorandum effectuating the obligation set forth above, the Union shall have the right to terminate the Agreement and this Memorandum by sending the Company a 24-hour telegraph or written notice. The sending of said notice shall effectuate the termination upon the expiration of the 24-hour period."

On June 26, 1969 AMA and MEBA executed a further "Memorandum of Understanding":

"The aforesaid Agreement [the contract expiring June 15, 1969] except as otherwise amended herein together with the provisions hereinafter set forth herein shall be deemed a new contract (herein "New Contract") to continue in full force and effect until midnight June 15, 1972."

By this language the parties clearly incorporated the no-strike and arbitration provisions that had previously existed. However, the last clause of this document reads:

"This New Contract shall be deemed to have become final and binding upon the Parties hereto only upon the fulfillment of two conditions: (a) Ratification of the New Contract by the membership of the Union and (b) written notification of such ratification given by the Union to the Company."

While MEBA claims that its membership ratified the "New Contract" in early July, 1969, it concedes that it never gave the required notice of ratification.

As a consequence of a dispute between the parties. which arose in the latter part of July, 1969, MEBA engineers refused from July 25 to July 30 to move the Sea Liberties ship, docked at New Orleans. The union claims that the refusal was due to a shortage of engineers that caused the ship to be undermanned by Coast Guard standards, and that moving the ship would have jeopardized the licenses of the engineers on board. The company claims that the engineers asserted that MEBA had ordered them not to work because the company had not signed a contract with the union. The company also suggests that the action against Sea Liberties was a result of the union's lack of success with similar tactics against Globe Seaways, which will be discussed below. In any event, the dispute was not resolved, and Sea Liberties excluded the MEBA engineers and sailed its ship with other personnel on July 31. In November 1969 MEBA submitted to arbitration its claim that the engineers were wrongfully discharged. Sea Liberties, denying that it had a contract with the union, refused to participate in the arbitration. The arbitrator eventually handed down the awards that MEBA seeks to have confirmed here.

The facts in the case of Globe Seaways, the tanker owner, are similar. When its contract expired on June 15, 1969, the parties apparently continued for some days under an oral extension. On June 27 AMA and MEBA executed a "Memorandum of Understanding" virtually identical to that of June 6 in the dry cargo case referred to above; the union had a right to terminate on 24 hours' written or telegraphed notice, and the company agreed to adopt any terms that a tanker trade group, the Tanker Service Committee, might agree to. MEBA and AMA subsequently concluded a document substantially similar to the dry cargo "agreement" of June 26, 1969. It too provided that it would not be "final and binding" until the MEBA membership had ratified it and MEBA had given notice to the company. Again, the union claims that the contract was ratified in July, and concedes that no notice was given. In this case, however, MEBA did not even *execute* the document until November, though it is "dated as of June 27, 1969." In July the union sent the contract, which included terms reached with the Tanker Service Committee, together with a separate letter concerning the employment of

"cadets," [4] to AMA for its signature. On July 15 AMA signed the basic agreement but not the cadet letter. That same day MEBA replied by letter, "This is insufficient since you have not signed the accompanying letter pertaining to assignment of Cadets sent to you for signature." AMA again refused, and beginning July 18 MEBA engineers refused to move Globe Seaways's tanker. Here again the union claims that the vessel was undermanned, whereas the company charges that the union was striking over the cadet letter and the lack of a contract between the parties.

By letter dated July 29, 1969 (which Globe Seaways claims was received July 31) the union withdrew its demand that the cadet letter be signed, no doubt in response to a complaint pending before the AFL–CIO.[5] This letter concluded: "We should like to arrange a meeting with you to discuss open matters in our collective bargaining relationship." As in the dry cargo case, the company discharged the MEBA engineers and procured non-MEBA personnel, and its ship sailed on July 30 or 31. MEBA again submitted to arbitration its claim for wrongful discharge and Globe Seaways refused to participate on the ground that there was no agreement to arbitrate in existence at the time of the discharges. Awards in favor of the engineers were handed down, and the union now seeks confirmation.

Whether we look to "ordinary" principles of contract law or to the national labor policy, the events in this case, and particularly the union's own conduct, show that there was no contract between the parties at the critical times.[6] The union never gave the required notification of ratification of the June 26 (dry cargo) "New Contract" or the tanker "New Contract" "dated as of June 27." In the tanker case, the union's insistence on the signing of the cadet letter until after it had struck, its admission that there were "open matters in our collective bargaining relationship," its own failure to sign the main agreement until the following November, and the strike itself, evidence a complete failure to reach an agreement. In the dry cargo case, although there is not the additional circumstance of the union's insistence on an issue not agreed upon by the parties, the union's failure to comply with the formalities of the June 26 "agreement" and its own strike are adequate evidence that it did not consider itself bound by the contract.

The invalidity of these agreements raises the question whether the interim extensions that were signed by the parties (June 6 for dry cargo, June 27 for tankers) are sufficient to bind them. MEBA itself claims, at least in the dry cargo case, that the interim "Memorandum of Understanding" was superseded by the later "New Contract," and we are inclined to agree as to both the dry cargo and tanker cases. Although the later documents did not become binding agreements, the parties' actions reveal an intent that the interim memoranda should no longer be in effect.

■ Alternatively, MEBA's striking in these circumstances can be viewed as an invocation of the 24-hour termination provisions contained in the interim ex-

4. In the background of this dispute, or perhaps more properly at its core, is a jurisdictional dispute between MEBA and the Seafarers International Union (SIU), which represents unlicensed seamen. In 1968, as a result of a complaint by SIU, the AFL–CIO ordered MEBA to cease its attempts to place unlicensed "apprentice engineers" or "cadets" represented by it on ships that had contracts with SIU or its affiliates for the representation of unlicensed personnel. On July 25, 1969, SIU complained to the AFL–CIO that

MEBA's demands of Globe Seaways regarding cadets were in violation of the Federation's previous determination, and on September 23, 1969 the AFL–CIO so held.

5. See note 4 *supra.*

6. We note in passing that a finding of no contract does not defeat jurisdiction under section 301(a). See Genesco, Inc. v. Joint Council 13, United Shoe Workers, 341 F.2d 482, 484 (2d Cir. 1965).

tensions. It should not lightly be inferred that a union, at its own choosing, can strike over some matters and arbitrate over others. Drake Bakeries, Inc. v. Local 50, American Bakery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), and Ice Cream Drivers Local 757 v. Borden, Inc., 433 F.2d 41 (2d Cir. 1970), cert. denied, 401 U.S. 940, 91 S.Ct. 938, 28 L.Ed.2d 220 (1971), holding that a strike does not free the employer from a contractual obligation to arbitrate, are inapposite, since they are predicated on the undisputed existence of an agreement to arbitrate.

 MEBA urges strongly that the companies in effect admitted the existence of contracts by making contributions to various pension, health, training, and vacation plans, and by employing engineers at the "new contract" rates. This argument is not persuasive. The logic of what we said in *Procter & Gamble, supra*, concerning performance under an expired agreement is equally applicable to performance under a contract that never came into effect.

"We reject appellee's argument that the agreement continued in effect by reason of the action of the parties. On May 13, the employer offered to continue the agreement in effect for another limited period. This offer met with a flat refusal from the union. The fact that the employer chose thereafter not to change many of the working conditions which had prevailed under the expired agreement does not tend in any way to establish that that agreement was, or was considered to be, or was treated as still effective. It is perfectly natural and entirely customary that, in the short hiatus which is expected to occur between the expiration of one collective agreement and the negotiation of the next, no great change will be made in the existing conditions. Sometimes, as here, a part of the hiatus is covered by an agreed-upon extension of the terms of the expiring agreement. Where no such extension is negotiated, or where the period of the extension has also expired, there is no ground whatever for considering that the old agreement still governs the relationship of the parties." (Footnote omitted.)

*Procter & Gamble, supra*, 312 F.2d at 184.

Since at the time of the discharges, MEBA did not have a valid contract to arbitrate with Globe Seaways and Sea Liberties, the district court was correct in refusing to confirm the awards.

Affirmed.