### DOMESTIC LINEN SUPPLY & LAUNDRY CO., a Michigan corporation, Plaintiff,

v.

### CENTRAL STATES, SOUTHEAST & SOUTHWEST AREAS PENSION FUND, an employee benefit plan; Current and Past Trustees and Administrators, Jointly and Severally, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and its Local Unions 285, 51, 332, 7, 486, 406, 580 and 164 and their officers; current and past, Jointly and Severally and the Michigan Conference of Teamsters Joint Council 43, Jointly and Severally, Defendants.

No. 88–71948.

United States District Court, E.D. Michigan, S.D.

Oct. 6, 1989.

---

Martin E. Crandall, Stringari, Fritz, Kreger, Ahearn, Bennett & Hunsinger, P.C., Detroit, Mich., for plaintiff.

Frank Kortsch and Gerry Miller, Milwaukee, Wis., for Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

## MEMORANDUM AND ORDER

### I.

COHN, District Judge.

■ This is an action brought under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. secs. 1961 *et seq.* Plaintiff Domestic Linen Co. (Domestic) alleges that defendants International Brotherhood of Teamsters (IBT) and certain local affiliates (local unions) forced the unlawful inclusion of supervisory and managerial employees in its collective bargaining unit and compelled pension fund contributions for such employees through threats of physical violence and economic ruin. Domestic sues under RICO, claiming that defendants committed numerous predicate acts to coerce them into making the unlawful pension contributions. Defendants move to dismiss the complaint on the grounds that they were legally entitled to request that supervisory employees be included in the bargaining unit and Domestic never pursued its administrative remedy for excluding the contested employees. The Court finds that Domestic has stated a colorable RICO claim.

### II.

In its amended complaint and RICO Case Statement, Domestic alleges the following facts, which must be taken as true for the purposes of the motion. *See Neitzke v. Williams,* — U.S. ——, ——, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338, 348 (1989).

1. In 1936, Domestic and the IBT local unions established a collective bargaining unit which included supervisory and managerial employees, RICO Case Statement para. 5(b).

2. In 1955, the Central States Southeast and Southwest Pension Fund (CSPF) was established as a multiemployer pension plan. Domestic began to pay the employers' contractual share of pension payments to CSPF for all employees in the bargaining unit. *Id.*

3. In 1960, Domestic attempted to remove the supervisory employees from the bargaining unit and discontinue paying pension fund payments on their behalf. In response, the IBT and its local affiliates caused to be conducted a series of wildcat strikes to force Domestic to maintain its level of contributions. Amended Complaint para. 32(a).

4. During a strike in 1970 and 1971, certain supervisory employees of Domestic were informed by various agents of the local unions that if they crossed the picket lines, they would lose their pension rights with the CSPF. Amended Complaint para. 32(b).

5. During contract negotiations with the local unions in early 1986, Domestic stated that it was going to withdraw from the CSPF. Negotiators for the unions threatened to strike Domestic if it withdrew. Domestic did not relent and its employees went out on strike on February 22, 1986. During subsequent negotiations, certain of defendants' agents told Domestic's representatives that the company's continued participation in the CSPF was non-negotiable and that they were prepared to put it out of business before they would compromise on the pension issue. Amended Complaint paras. 5(c)–(f); RICO Case Statement para. 2(B).

6. During the 1986 strike, threats of physical violence and property damage and actual incidents of physical violence and property damage occurred in Kalamazoo, Jackson, Grand Rapids, and Detroit. RICO Case Statement paras. 2(C)–(I) and 5(B).

7. Joint Council 43 and a representative from Local 285 acted as the negotiators for the local unions during the 1986 strike. The Joint Council's negotiator, Dennis Hands, told plaintiff's representatives that "if Domestic did not take the supervisors out of the bargaining unit he would resolve their pension problems ..." RICO Case Statement para. 2(J). In addition, Jack Brand (Brand), a union Business Agent in Kalamazoo and Chairman of the Outstate Grievance Committee, stated that "Domestic ... would be struck nationally by the IBT and that it could not withdraw from the Union or discontinue contributions on behalf of the supervisors to the CSPF." RICO Case Statement para. 3. On another occasion, Brand stated that Domestic "could not keep supervisors out of the bargaining unit and could not discontinue making contributions on their behalf and could not withdraw from the Union without being shut down nationally." *Id.* At least eight other union representatives conveyed the same message to plaintiff's agents during the course of the strike. *Id.*

8. In February 1986, representatives of defendant assured Domestic's negotiators that if it remained with the CSPF, supervisor pensions would be duly provided. Amended Complaint para. 5(g).

9. Since 1955, defendants have contended that the challenged managerial and supervisory employees were in fact "route relief drivers" who should lawfully be included in the bargaining unit and who would receive pension benefits upon retirement. Amended Complaint para. 37. Relying on these representations, plaintiff continued to pay contributions to the CSPF for such employees until 1984. The statements that such "route relief drivers" would be paid benefits was untrue. Amended Complaint para. 37(i). Domestic's supervisors were denied pensions after years of contributions on

their behalf. RICO Case Statement para. 2(B).

10. During strike negotiations, defendants refused to submit plaintiff's proposed 401(k) plan to its membership. Amended Complaint para. 5(h); RICO Case Statement para. 2(B).

## III.

### A.

Defendants' motion to dismiss is predicated on the grounds that the activities described as predicate acts are in fact concerted activities protected by section 7 of the National Labor Relations Act (NLRA), 29 U.S.C. sec. 157. They argue that it is perfectly lawful for a union to request the inclusion of supervisory employees in a bargaining unit and an employer may voluntarily consent to their inclusion. Domestic replies that while a union may lawfully request the inclusion of supervisors in a bargaining unit, they may not resort to coercion to accomplish this goal. Both statements are correct.

In the Taft–Hartley Amendments to the NLRA, Labor Management Relations Act of 1947, Pub.L. No. 80–101, 61 Stat. 137, Congress amended the statutory definition of "employee" to exclude persons employed as supervisors. 29 U.S.C. sec. 152(11). Concerted activities by such employees are not therefore protected activity. However, section 14(a) of the Taft–Hartley Amendments provides:

> Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purposes of any law, either national or local, relating to collective bargaining.

29 U.S.C. sec. 164(a). These provisions create the anomalous situation that supervisors are free to organize and become members of collective bargaining units, but employers are free not to recognize them, *Florida Power & Light v. Electrical Workers,* 417 U.S. 790, 808, 94 S.Ct. 2737,

2746, 41 L.Ed.2d 477 (1974), and to discharge supervisors for their union membership and activities, *Beasley v. Food Fair of North Carolina,* 416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974). By the same token, however, employers may still bargain with supervisor-unions members if they voluntarily choose to do so. *Florida Power & Light, supra.* Discussing this option-approach to conflict of loyalties questions, the District of Columbia Court of Appeals explained

> a union commits no unfair or unlawful act in proposing that supervisors be covered by the collective bargaining agreement. *Sakrete of Northern California, Inc. v. NLRB,* 9 Cir., 332 F.2d 902, 908 (1964), *cert. denied,* 379 U.S. 961 [85 S.Ct. 649, 13 L.Ed.2d 556] (1965), but a union does commit an unfair labor practice in trying to coerce an employer into agreeing to hire only union members as foremen. *See Int. Typographical Union Local 38 v. NLRB,* 1 Cir., 278 F.2d 6 (1960), affirmed by an equally divided court, 365 U.S. 705, 707 [81 S.Ct. 855, 856, 6 L.Ed.2d 36] (1961). An employer is within his rights in refusing to engage in collective bargaining over supervisors, *cf. Safeway Stores Inc. v. Retail Clerks Int. Assn.,* 41 Cal.2d 567, 261 P.2d 721 (1953), and supervisors are routinely excluded from a certified bargaining unit at the employer's request. *See, e.g. Federal Compress & Warehouse Co. v. NLRB,* 6 Cir., 398 F.2d 631 (1968); *NLRB v. Corral Sportswear Co.,* 10 Cir., 383 F.2d 961 (1967).

*International Brotherhood of Electrical Workers v. N.L.R.B.,* 487 F.2d 1143, 1165 (D.C.Cir.1973), *aff'd. sub nom Florida Power & Light v. Electrical Workers, supra.* This passage makes clear that a union may not strike over an employer's refusal to include supervisory employees in the collective bargaining unit. *See also*

*Florida Power, supra* 417 U.S. at 813 n. 23, 94 S.Ct. at 2749 n. 23.[1]

### IV.

The fact that defendants activities were not protected by the NLRA does not necessarily mean that they rose to the level of predicate acts. In order to determine whether Domestic's allegations state a RICO claim, it is necessary to look at the particular predicate acts alleged.

### A.

Plaintiff claims that defendants conduct during the 1986 strike violated the Hobbs Act, 18 U.S.C. sec. 1951. The Hobbs Act makes it a crime to obstruct the movement of goods through interstate commerce through robbery, extortion, threats or acts of physical violence to persons or property. The term "extortion" is defined as "the obtaining of property from another with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. sec. 1951(b)(2).

▪ Plaintiff has clearly alleged a prima facie Hobbs Act case. The amended complaint and RICO Case Statement are replete with allegations that the 1986 strike was characterized by violence and threats of violence in an attempt to force plaintiff to continue making contributions to the CSPF on behalf of supervisors. As explained earlier, defendants could not lawfully strike over the demand that supervisors be included in the bargaining unit. *A fortiori,* defendants could not strike to compel pension fund payments for such non-bargaining unit employees. This certainly constitutes the "wrongful use of ... force" as defined in the Hobbs Act. Of course, defendants could strike over plaintiff's threat to withdraw from the CSPF

1. Many courts have held that actions by employers and courts to impede concerted activities by supervisors are not prohibited by the NLRA. In *Hanna Mining Co. v. District 2, Marine Engineers Beneficial Ass'n.,* 382 U.S. 181, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965), the Supreme Court held that the NLRA did not preclude a state court from enjoining picketers seeking to compel recognition of a supervisory union. Similarly, in *Safeway Stores, Inc., supra,* one of the cases cited with approval by the Court of Appeals in *Electrical Workers,* the California Supreme Court upheld an injunction against a strike over an employer's refusal to bargain with respect to managers on the grounds that the union could not coerce the employer to do so. In *Beasley v. Food Fair of North Carolina, supra,* the Supreme Court held that an employer may lawfully discharge supervisory employees solely because of their union membership.

altogether because pension fund contributions for legitimate bargaining unit employees would be a compulsory subject of collective bargaining. Here, the facts surrounding just to which employee group particular threats and demands applied are in dispute. However, resolution of these ambiguities must await summary judgment or a trial on the merits. It is enough at this stage of the case to note that plaintiff has alleged that defendants resorted to unlawful economic coercion and physical violence resulting in an obstruction of the movement of goods through commerce.

At the hearing held on March 31, 1989, defendants claimed that plaintiff's Hobbs Act claim should be dismissed under *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). In *Enmons* the Supreme Court held that the Hobbs Act could not be construed to reach acts of violence which occur in the course of legitimate concerted activities. As noted earlier, the inclusion of supervisors in a bargaining unit is not a legitimate collective bargaining objective and *Enmons* is therefore inapplicable. *See also United States v. Green*, 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494 (1956) (Hobbs Act prosecution upheld where force and violence were employed to compel concessions from the employer which the union had no legitimate right to demand).

### B.

█ The same allegations which state a claim for violation of the Hobbs Act also constitute a prima facie violation of Michigan's crime of extortion. Section 213 of the Michigan criminal code makes it a crime to "maliciously threaten injury to any person or property ... with intent thereby to money or any pecuniary advantage whatever, with intent to compel the person so threatened to do or refrain from doing any act against his will ..." Mich. Comp.Laws sec. 750.213. The amended complaint and RICO Case Statement clearly allege that defendants threatened to shut Domestic down unless it agreed to their unlawful demand to continue making pension payments on behalf of supervisory employees. These threats, if true, certainly fall within the four corners of the statute. While plaintiff's pleadings sometimes

conflate defendants' alleged threats with regard to total withdrawal from the CSPF and the alleged threats with regard to the supervisors, paragraph 3 of the RICO Case Statement sufficiently describes unlawful threats to state an extortion claim under Michigan law.

### C.

Domestic's mail fraud allegations rest on separate factual allegations than the extortion and Hobbs Act claims. Specifically, Domestic alleges that it was induced to make pension fund contributions on behalf of supervisors through a fraudulent scheme whereby defendants represented that supervisory employees were to be designated "route relief drivers" who were entitled to participate in the pension plan. Domestic says that it relied on defendants' representations that supervisors would receive pensions upon retirement. It alleges that these statements were untrue, defendants knew they were untrue, and that these representations were made with the intent to deceive Domestic.

█ Defendants object that they were separate and distinct entities from the CSPF and had no control over its decisions to authorize the payment of benefits. They claim that for this reason, they cannot be liable for mail fraud as a matter of law. This argument misconstrues Domestic's allegations. Regardless of defendants' actual authority, Domestic alleges that they represented that payments to supervisors would actually be made and that Domestic relied on those representations. The question of whether defendants actually controlled the payment of benefits is beside the point. Domestic has not alleged that defendants caused payments not to be made. All Domestic says is that defendants induced it to make contributions to the CSPF on behalf of supervisors through knowingly false representations. This is sufficient to state a mail fraud claim regardless of their actual authority to direct the payment of benefits.

### D.

Domestic also alleges that defendants violated the federal employee benefit plan

embezzlement statute, 18 U.S.C. sec. 664, which provides that a person shall be guilty of embezzlement if he or she "embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or the use of another, any of the ... assets of an employee welfare benefit plan...." Domestic alleges that

> from 1955 to the present, several employees of Domestic and other Michigan companies, who were not entitled to Central States pension benefits, were awarded such benefits by Central States, aided and abetted by defendant locals.... These individuals for whom pension payments have been illegally disbursed include Sam Cascade, Fred Westfield, Karl Greenberg, Phillip Nelson, Jack Yurofsky and others.

Amended complaint para. 38.

■ The problem with this claim is that Domestic has not specifically alleged how it was injured by defendant's wrongful conduct. RICO affords a civil remedy only to those persons "injured in [their] business or property by reason of a violation of section 1962." 18 U.S.C. sec. 1964(c). *See also Haroco, Inc. v. American National Bank & Trust of Chicago*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd.* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Unless Domestic can allege injury arising from this conduct, no RICO claim is made out.

Domestic alleges in conclusory terms that its withdrawal liability from the CSPF increased because of the payment of pension contributions to the above named individuals. This is no statement of how or why this would necessarily be so. Given the sheer magnitude of the CSPF, it is inconceivable that payments made to a relative handful of individuals could have more than an infinitesimal impact on Domestic's withdrawal liability. Accordingly, Domestic's 18 U.S.C. sec. 664 claim must be DISMISSED.

### V.

Defendants argue that Domestic should be precluded from objecting to the inclusion of supervisors in the bargaining unit because it never availed itself of the NLRB unit clarification procedure. 29 C.F.R. sec. 102.60 provides a procedure whereby an employer may request an investigation into the appropriateness of a given bargaining unit. Presumably plaintiff could have done so and secured an NLRB order removing the supervisors from the bargaining unit. Similarly, plaintiff could have filed an unfair labor practice charge over defendants' 1986 strike to compel continued pension plan contributions for supervisors. Domestic never pursued either remedy.

■ While the NLRA generally preempts all competing state and federal laws which purport to regulate labor relations, *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), there remain certain areas which are not covered and where other laws are free to apply. For example, general criminal statutes may be applied to violent acts committed in the course of a labor dispute by the states, *Auto Workers v. Wisconsin Employment Relations Board*, 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956), or the federal government, *United States v. Thordarson*, 646 F.2d 1323, 1330–32 (9th Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981). Similarly, civil sanctions for tortious conduct committed in the course of a labor dispute may also be applied. *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). Where the NLRA does not totally preempt competing law, there is no obligation for an aggrieved person to first exhaust his administrative remedies before the NLRB, even though the Board could order remedies which could effectively remedy the wrongful conduct. *Linn, supra* 383 U.S. at 66, 86 S.Ct. at 664; *Auto Workers, supra* 351 U.S. at 272–74, 76 S.Ct. at 798–99. Accordingly, the fact that Domestic failed to file an unfair labor practice charge or file a petition for unit clarification with the NLRB does not preclude it from now filing a RICO action for defendants' alleged wrongful acts.

### VI.

Finally, defendants claim that because they exercised no control over CSPF, they

can not be guilty of aiding and abetting its allegedly criminal conduct. This may well be true. However, with the arguable exception of the mail fraud claim, Domestic's complaint alleges independent violations of the criminal laws without regard to the actions of CSPF. Certainly, the conduct upon which the Hobbs Act violations and the state law extortion violations are based have nothing to do with the CSPF. As to Domestic's allegations of mail fraud, it is alleged that defendants knew that pensions would not be paid to supervisors, falsely represented that they would be paid, and Domestic relied on that representation. This conduct is separate and distinct from any discretionary actions that the CSPF may or may not have taken. It may well be shown following discovery that, in fact, defendants honestly thought that the pensions would be paid. However, on a motion to dismiss based on Fed.R.Civ.P. 12(b)(6), Domestic's allegations must be taken as true. Resolution of the factual disputes must await summary judgment or a full trial on the merits.

SO ORDERED.