Kathy ARENA, Plaintiff-Appellant-Petitioner,

v.

LINCOLN LUTHERAN OF RACINE,
WISCONSIN, INC., and Elaine Dyer,
Defendants-Respondents.

Supreme Court

*No. 87–1186. Argued November 29, 1988.—Decided April 5, 1989.*

(Also reported in 437 N.W.2d 538.)

For the plaintiff-appellant-petitioner there were briefs by *Phillip J. Ramthun,* and *Duane L. Arena, S.C.,* Racine, and oral argument by *Mr. Arena.*

For the defendants-respondents there was a brief by *John M. Loomis, Katherine L. Williams,* and *Beck, Chaet & Loomis, S.C.,* Milwaukee, and oral argument by *John M. Loomis.*

LOUIS J. CECI, J. This case is before the court on petition for review of an unpublished decision of the court of appeals, dated January 13, 1988, which affirmed an order of the circuit court for Racine county, Stephen A. Simanek, circuit judge, granting summary judgment to the respondents. Two issues are presented for review. The first issue is whether the petitioner's cause of action based on an alleged violation of secs. 133.03 and 134.01, Stats., and for wrongful discharge under Wisconsin law is preempted by the National Labor Relations Act (NLRA) sec. 14(a), 29 U.S.C. sec. 164(a).[1] The second issue is, providing that we determine that the petitioner's cause of action is not preempted by the NLRA, whether the petitioner's complaint alleges a cause of action under Wisconsin law for a violation of secs. 133.03 and 134.01, and for wrongful discharge. We conclude that the petitioner's cause of action for an alleged violation of secs. 133.03 and 134.01 and for wrongful discharge is preempted by NLRA sec. 14(a), 29 U.S.C. sec. 164(a). Consequently, we do not reach the second issue presented for review.

The facts in this case are as follows. The petitioner was discharged from her employment as a registered

[1]NLRA sec. 14(a), 29 U.S.C. sec. 164(a) (1982), provides as follows:

> Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

nurse at Becker-Shoop Center on October 22, 1986. Becker-Shoop Center is a nursing facility owned and operated by Lincoln Lutheran of Racine, Wisconsin, Inc. (Lincoln Lutheran). On November 10, 1986, the petitioner commenced an action in the circuit court for Racine county against Lincoln Lutheran and Elaine Dyer, the director of nursing at Becker-Shoop Center, for wrongful discharge.

The petitioner alleged in her complaint that prior to September 23, 1985, she had become concerned with certain policies at the Becker-Shoop Center, including, but not limited to, nurses being treated in an arbitrary manner. Consequently, on September 23, 1985, the petitioner held a nurses' meeting to explore the options available to the nurses in regard to presenting their concerns to their employer, including the formation of an association or organization to represent the collective interests of the nurses. This meeting was not held on work premises.

On September 30, 1985, the petitioner received a written reprimand from Daniel Langenwalter, the administrator of Becker-Shoop Center, which noted that the petitioner had complaints about the nursing service department at Becker-Shoop Center and that she had discussed those complaints at work on work time with other nurses. The reprimand indicated that Langenwalter had no problem with the fact that the petitioner had complaints, but pointed out that there was a complaint procedure set out in the Lincoln Lutheran employee handbook. The reprimand noted that since the petitioner had failed to follow the prescribed procedure, she was being warned and directed henceforth to follow the applicable procedures under pain of disciplinary action, up to and including termination. The letter also contained a statement of Lincoln Lutheran's view of the status of registered nurses at the Becker-Shoop

Center: "[A]s a staff R.N. you are considered a professional and part of the management team. Discussion of management-related concerns you may have relative to the operation of Becker-Shoop Center or Lincoln Lutheran of Racine, WI., Inc. with subordinates is not appropriate." Langenwalter concluded by suggesting that Arena put any questions about this matter in writing and send them to Elaine Dyer, the director of nursing, or himself.

On October 1, 1985, the petitioner's attorney advised Lincoln Lutheran that the written reprimand from Lincoln Lutheran to the petitioner dated September 30, 1985, violated ch. 111, Stats., and that legal action would be taken if the petitioner was terminated in accordance with the reprimand. Thereafter, the petitioner alleged, the respondents engaged in a policy of harassment of the petitioner which culminated in the petitioner's termination on October 22, 1986.

The petitioner's complaint concluded by alleging that the respondents decided to terminate petitioner because of concern that petitioner might attempt to form an organization to represent respondent's nurses and that said action by the respondents was contrary to secs. 134.01[2] and 133.03,[3] Stats. The complaint also

[2]Section 134.01, Stats., provides as follows:

**134.01 Injury to business; restraint of will.** Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

[3]Section 133.03, Stats., provides as follows:

**133.03 Unlawful contracts; conspiracies. (1)** Every contract, combination in the form of trust or otherwise, or conspiracy, in

alleged that petitioner's termination was wrongful and contrary to secs. 134.01, 133.03, 103.51,[4] 111.04,[5] and

*restraint of trade or commerce is illegal. Every person who makes any contract or engages in any combination or conspiracy in restraint of trade or commerce may be fined not more than $100,000 if a corporation, or, if any other person, $50,000, or be imprisoned for not more than 5 years, or both.*

(2) Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce may be fined not more than $100,000 if a corporation, or, if any other person, $50,000, or be imprisoned for not more than 5 years, or both.

(3) As an alternative to the criminal penalties for violation of this section, the department of justice or district attorney may bring an action for a civil forfeiture. In an action for a civil forfeiture under this subsection a corporation may be required to forfeit not more than $100,000 and any other person may be required to forfeit not more than $50,000.

[4]Section 103.51, Stats., provides as follows:

**103.51 Public policy as to collective bargaining.** In the interpretation and application of ss. 103.51 to 103.62 the public policy of this state is declared as follows:

Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employes. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and the designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

[5]Section 111.04, Stats., provides as follows:

111.06(1)(a), (b), (c), and (2),[6] Stats., and in violation of the petitioner's right of free speech.

**111.04 Rights of employes.** Employes shall have the right of self-organization and the right to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection; and such employes shall also have the right to refrain from any or all of such activities.

[6]Section 111.06, Stats., provides in part as follows:

**111.06 What are unfair labor practices. (1)** It shall be an unfair labor practice for an employer individually or in concert with others:

(a) To interfere with, restrain or coerce his employes in the exercise of the rights guaranteed in s. 111.04.

(b) To initiate, create, dominate or interfere with the formation or administration of any labor organization or contribute financial support to it, provided that an employer shall not be prohibited from reimbursing employes at their prevailing wage rate for the time spent conferring with him, nor from cooperating with representatives of at least a majority of his employes in a collective bargaining unit, at their request, by permitting employe organizational activities on company premises or the use of company property facilities where such activities or use create no additional expense to the company, provided, however, that it shall not be an unfair labor practice for an employer to become a member of the same labor organization of which his employes are members, when he and they work at the same trade.

(c) 1. To encourage or discourage membership in any labor organization, employe agency, committee, association or representation plan by discrimination in regard to hiring, tenure or other terms or conditions of employment. An employer is not prohibited from entering into an all-union agreement with the voluntarily recognized representative of the employes in a collective bargaining unit, where at least a majority of such employes voting have voted affirmatively, by secret ballot, in favor of such all-union agreement in a referendum conducted by the [employment relations] commission, except that where the bargaining representative has been certified by either the commission or the national labor relations board as the result of a representation election, no referendum is

required to authorize the entry into such an all-union agreement. Such authorization of an all-union agreement shall be deemed to continue thereafter, subject to the right of either party to the all-union agreement to petition the commission to conduct a new referendum on the subject. Upon receipt of such petition, the commission shall determine whether there is reasonable ground to believe that the employes concerned have changed their attitude toward the all-union agreement and upon so finding the commission shall conduct a referendum. If the continuance of the all-union agreement is supported on any such referendum by a vote at least equal to that provided in this subdivision for its initial authorization, it may be continued in force thereafter, subject to the right to petition for a further vote by the procedure set forth in the subdivision. If the continuance of the all-union agreement is not thus supported on any such referendum, it is deemed terminated at the termination of the contract of which it is then a part or at the end of one year from the date of the announcement by the commission of the result of the referendum, whichever is earlier. The commission shall declare any all-union agreement terminated whenever it finds that the labor organization involved has unreasonably refused to receive as a member any employe of such employer, and each such all-union agreement shall be made subject to this duty of the commission. Any person interested may come before the commission as provided in s. 111.07 and ask the performance of this duty. Any all-union agreement in effect on October 4, 1975, made in accordance with the law in effect at the time it is made is valid.

2. It is not a violation of this subchapter for an employer engaged primarily in the building and construction industry where the employes of such employer in a collective bargaining unit usually perform their duties on building and construction sites, to negotiate, execute and enforce an all-union agreement with a labor organization which has not been subjected to a referendum vote as provided in this subchapter.

3. It is not a violation of this subchapter for an employer engaged in the truck transportation of freight in the motor freight industry as a common or contract carrier of property as defined in s. 194.01(1) and (2) to negotiate, execute and enforce an all-union agreement with a labor organization representing employes in a multi-state bargaining unit which has not been subjected to a

42

the petitioner's complaint was that the petitioner was terminated for her organizational activities. The circuit court found that such conduct is arguably protected by

referendum vote as provided in this subchapter; except that an election shall be held if a petition requesting such election is signed by 30% of the employes affected.

4. It is not a violation of this subchapter for an orchestra or band leader engaged to provide live musical entertainment to enter into or comply with a policy, practice or contract in which all of the musicians must be members of a labor organization as a condition of hire or employment without such policy, practice or contract being subject to a referendum vote as provided in this subchapter.

. . .

(2) It shall be an unfair labor practice for an employe individually or in concert with others:

(a) To coerce or intimidate an employe in the enjoyment of his legal rights, including those guaranteed in s. 111.04, or to intimidate his family, picket his domicile, or injure the person or property of such employe or his family.

(b) To coerce, intimidate or induce any employer to interfere with any of his employes in the enjoyment of their legal rights, including those guaranteed in s. 111.04, or to engage in any practice with regard to his employes which would constitute an unfair labor practice if undertaken by him on his own initiative.

(c) To violate the terms of a collective bargaining agreement (including an agreement to accept an arbitration award).

(d) To refuse or fail to recognize or accept as conclusive of any issue in any controversy as to employment relations the final determination (after appeal, if any) of any tribunal having competent jurisdiction of the same or whose jurisdiction the employes or their representatives accepted.

(e) To cooperate in engaging in, promoting or inducing picketing (not constituting an exercise of constitutionally guaranteed free speech), boycotting or any other overt concomitant of a strike unless a majority in a collective bargaining unit of the employes of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike.

(f) To hinder or prevent, by mass picketing, threats, intimidation, force or coercion of any kind the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment, or to obstruct or interfere with free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance.

NLRA sec. 7, 29 U.S.C. sec. 157.[7] Therefore, the circuit court concluded that the proper forum for the petitioner's complaint was the National Labor Relations Board (NLRB) and that the circuit court was preempted from exercising jurisdiction. Consequently, the circuit court ordered summary judgment in favor of the respondents.

The court of appeals affirmed the trial court's order on different grounds. The court of appeals held, citing

(g) To engage in a secondary boycott; or to hinder or prevent, by threats, intimidation, force, coercion or sabotage, the obtaining, use or disposition of materials, equipment or services; or to combine or conspire to hinder or prevent, by any means whatsoever, the obtaining, use or disposition of materials, equipment or services, provided, however, that nothing herein shall prevent sympathetic strikes in support of those in similar occupations working for other employers in the same craft.

(h) To take unauthorized possession of property of the employer or to engage in any concerted effort to interfere with production except by leaving the premises in an orderly manner for the purpose of going on strike.

(i) To fail to give the notice of intention to strike provided in s. 111.11.

(j) To commit any crime or misdemeanor in connection with any controversy as to employment relations.

(l) To engage in, promote or induce a jurisdictional strike.

(m) To coerce or intimidate an employer working at the same trade of his employes to induce him to become a member of the labor organization of which they are members, permissible pursuant to s. 111.06(1)(b).

[7]NLRA sec. 7, 29 U.S.C. sec. 157 (1982), provides as follows:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

*Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 335 N.W.2d 834 (1983), and *Bushko v. Miller Brewing Co.,* 134 Wis. 2d 136, 396 N.W.2d 167 (1986), that the petitioner's allegation of wrongful discharge did not rise to a cause of action under Wisconsin law. The court of appeals noted that these cases created an exception to the employment-at-will doctrine which is "narrow and limited to instances where an employer requires an employee to violate the clear language or spirit of a statutory or constitutional provision and then terminates the employee for a refusal." The court of appeals concluded that the petitioner's activities were merely consistent with stated public policy and, therefore, could not give rise to a wrongful discharge cause of action. The court of appeals did not determine whether the petitioner's claim was preempted by the NLRA.

In addition to the petitioner's action in state court, on February 4, 1987, the petitioner also filed a charge with the Milwaukee office of the NLRB, alleging that Lincoln Lutheran had discharged her from her employment for concerted activity in attempting to organize a nurses' association, in violation of NLRA sec. 8(a)(1), 29 U.S.C. sec. 158(a)(1).[8] The NLRB issued a complaint on March 27, 1987, (NLRB Case No. 30–CA–9464) charging respondents with violations of NLRA sec. 8(a)(1), 29 U.S.C. sec. 158(a)(1), and alleging Lincoln Lutheran to be an employer engaged in commerce within the meaning of the NLRA.

---

[8]NLRA sec. 8(a)(1), 29 U.S.C. sec. 158(a)(1) (1982), provides as follows:

> It shall be an unfair labor practice for an employer—
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

On March 30, 1987, a notice of hearing issued in the case, setting a hearing date of June 22, 1987, on the allegations contained in the NLRB's administrative complaint. Hearings were held before an administrative law judge of the NLRB on June 23 and August 3 and 4, 1987. At the time of the hearing before the circuit court and the review by the court of appeals in this matter, disposition by the administrative law judge was as yet undetermined.

On April 29, 1988, the administrative law judge found that the petitioner had been discharged for concerted activity within the meaning of NLRA sec. 7, 29 U.S.C. sec. 157. However, because the administrative law judge also found that the petitioner was a supervisor by definition under NLRA sec. 2(11), 29 U.S.C. sec. 152(11),[9] the administrative law judge ruled that the petitioner's discharge did not constitute a violation of NLRA sec. 8(a)(1), 29 U.S.C sec. 158(a)(1), because the activities of supervisors are not entitled to the NLRA's protections. The general counsel for the NLRB excepted to the administrative law judge's findings, and the case went before the NLRB. Neither party filed exceptions to the administrative law judge's findings that the petitioner was engaged in concerted activity within the meaning of NLRA sec. 7, 29 U.S.C. sec. 157.

---

[9]NLRA sec. 2(11), 29 U.S.C. sec. 152(11) (1982), provides as follows:

> The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

On August 31, 1988, the NLRB considered the April 29, 1988, decision of the administrative law judge and the record and briefs in light of the exceptions and decided to affirm the administrative law judge's rulings, findings and conclusions and to adopt the recommended order. Consequently, the petitioner's complaint before the NLRB was dismissed.

The first issue before this court is whether the petitioner's cause of action based on an alleged violation of secs. 133.03 and 134.01, Stats., and for wrongful discharge can be maintained in state court or whether federal law preempts such a claim. This case is before this court on review of a summary judgment motion. Consequently, we will apply the standards set forth in sec. 802.08(2), Stats., in the same manner as the circuit court. *Bell v. County of Milwaukee,* 134 Wis. 2d 25, 30, 396 N.W.2d 328 (1986). As such, we will decide questions of law independently, without deference to the decision of the circuit court or the court of appeals. *Id.*

The extent of federal labor law preemption of state labor law claims has been frequently litigated. Two lines of federal labor law preemption have developed which warrant discussion. The first line originated in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244-45 (1959). In *Garmon,* the United States Supreme Court articulated the following rule concerning federal labor law preemption of state labor law claims, a rule premised on Congress's desire to avoid conflicting rules of substantive law and remedy, thereby ensuring a consistent labor policy. *Id.* at 242.

When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by sec. 7 of the National Labor Relations Act, or constitute an unfair labor practice under sec. 8, due regard for the federal enactment requires that state jurisdiction must yield. ...

... When an activity is arguably subject to sec. 7 or sec. 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

To require the States to yield the primary jurisdiction of the National Board does not ensure Board adjudication of the status of a disputed activity. If the Board decides, subject to appropriate federal judicial review, that conduct is protected by sec. 7, or prohibited by sec. 8, then the matter is at an end, and the States are ousted of all jurisdiction. Or, the Board may decide that an activity is neither protected nor prohibited, and thereby raise the question whether such activity may be regulated by the States.

*Id.* at 244–45. The *Garmon* test, therefore, is two-pronged. First, if the conduct at issue is either clearly protected by NLRA sec. 7, 29 U.S.C. sec. 157, or clearly prohibited by NLRA sec. 8, 29 U.S.C. sec. 158, the states are totally preempted from all jurisdiction. *Id.* at 244. Second, even if the conduct is not clearly protected or prohibited, the states as well as the federal courts must defer to the exclusive competence of the NLRB if the conduct at issue is arguably within the compass of NLRA sec. 7 or sec. 8. *Id.* at 244–45.

The Supreme Court noted in *Garmon,* however, two exceptions to a finding of federal labor law preemption

48

based on "due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy . . . ." *Id.* at 243. The first exception is that the preemption doctrine does not prevent states from exercising their power to regulate activities that are a merely peripheral concern of the Labor-Management Relations Act (LMRA). *Id.* The second exception is that the preemption doctrine does not prevent states from exercising their power where the regulated conduct touches interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it cannot be inferred that Congress has deprived the states of the power to act. *Id.* at 244.[10]

The second relevant line of United States Supreme Court cases dealing with federal labor law preemption of state law claims focuses on the understanding that Congress has struck a balance of power between labor and management in enacting the federal labor relations scheme and that states must not be permitted to upset that balance by outlawing a particular weapon which Congress has chosen to leave available to the parties. *Lodge 76, International Association of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 140 (1976); *Garner v. Teamsters Union,* 346 U.S. 485, 499–500 (1953). This

---

[10]More recently, the Supreme Court has observed that while the *Garmon* formulation accurately reflects the basic concern with potential state interference with national labor policy, the history of labor law preemption does not support an approach which sweeps away state court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected. *See Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 188 (1978).

line of preemption is based on federal protection of the conduct in question. *Machinists*, 427 U.S. at 138. The crucial inquiry under this line is whether Congress intended that the conduct involved be unregulated because Congress determined that the conduct should be left "'to be controlled by the free play of economic forces.'" *Id.* at 140, quoting in part *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971).[11]

---

[11]*See* Cox, *Labor Law Preemption Revisited*, 85 Harv. L. Rev. 1337, 1352 (1972):

> An appreciation of the true character of the national labor policy expressed in the NLRA and the LMRA indicates that in providing a legal framework for union organization, collective bargaining, and the conduct of labor disputes, Congress struck a balance of protection, prohibition, and laissez faire in respect to union organization, collective bargaining, and labor disputes that would be upset if a state could also enforce statutes or rules of decision resting upon its views concerning accommodation of the same interests.

*Cf.,* Lesnick, *Preemption Reconsidered: The Apparent Reaffirmation of Garmon,* 72 Colum. L. Rev. 469, 478, 480 (1972):

> [T]he failure of Congress to prohibit certain conduct warrant[s a] negative inference that it was deemed proper, indeed desirable—at least, desirable to be left for the free play of contending economic forces. Thus, the state is not merely filling a gap when it outlaws what federal law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available.

> \* \* \*

> The premise is ... that Congress judged whether the conduct was illicit or legitimate, and that 'legitimate' connotes, not simply that federal law is neutral, but that the conduct is to be assimilated to the large residual area in which a regime of free collective bargaining—'economic warfare,' if you prefer—is thought to be the course of regulatory wisdom.

In *Machinists,* the Supreme Court held that a union's concerted refusal to work overtime is peaceful conduct constituting an activity which must be free of regulation by the states if the congressional intent in enacting the comprehensive federal law of labor relations is not to be frustrated. *Machinists,* 427 U.S. at 155. Consequently, the Court reversed a decision by this court which upheld the jurisdiction of the Wisconsin Employment Relations Commission to issue a cease and desist order to the union. The Court found that the state had impermissibly intruded into the collective bargaining process. *Id.* at 148–49.[12]

The Court, however, noted that although many of its past decisions concerning conduct left by Congress

---

[12]The Court wrote:

> There is simply no question that the Act's processes would be frustrated in the instant case were the State's ruling permitted to stand. The employer in this case invoked the Wisconsin law because it was unable to overcome the Union tactic with its own economic self-help means. Although it did employ economic weapons putting pressure on the Union when it terminated the previous agreement, *supra,* at 134, it apparently lacked sufficient economic strength to secure its bargaining demands under 'the balance of power between labor and management expressed in our national labor policy,' *Teamsters Union v. Morton,* 377 U.S. [252], at 260 [(1964)]. But the economic weakness of the affected party cannot justify state aid contrary to federal law for, as we have developed, 'the use of economic pressure by the parties to a labor dispute is not a grudging exception [under] ... the [federal] Act; it is part and parcel of the process of collective bargaining.' *Insurance Agents,* 361 U.S. [361], at 495 [(1960)]. The state action in this case is not filling 'a regulatory void which Congress plainly assumed would not exist,' *Hanna Mining Co. v. Marine Engineers,* 382 U.S. [181], at 196 [(1965)] (Brennan, J., concurring). Rather, it is clear beyond question that Wisconsin '[entered] into the substantive aspects of the bargaining process to an extent Congress has not countenanced.' *NLRB v. Insurance Agents, supra,* at 498.

427 U.S. at 148–49 (footnotes omitted).

to the free play of economic forces addressed the question in the context of union and employee activities, self-help is also the prerogative of the employer, because an employer as well as an employee may properly utilize economic weapons which Congress meant to be unregulable. *Id.* at 147.

> '[R]esort to economic weapons should more peaceful measures not avail' is the right of the employer as well as the employee, *American Ship Bldg. Co. v. NLRB*, 380 U.S. [300], at 317 [(1965)], and the State may not prohibit the use of such weapons or 'add to an employer's federal legal obligations in collective bargaining' any more than in the case of employees.

*Id.,* quoting Cox, *Labor Law Preemption Revisited,* 85 Harv. L. Rev. at 1365.[13]

In the case before this court, the petitioner argues that the NLRB jurisdiction does not preempt or prevent Wisconsin courts from exercising their jurisdiction in this case. The petitioner maintains that her

---

[13]A state cannot add to an employer's federal legal obligations in collective bargaining even though nothing in section 7 protects any employer activities and NLRB decisions conclusively demonstrate that the particular conduct which the state would regulate is not arguably prohibited by section 8(a).

Virtually all the decisions conform to the proposition deduced from [*Teamsters Union v. Morton,* 377 U.S. 252 (1964)]: unless the conduct is actually protected against employer interference by sections 7 and 8(a)(1), a state's jurisdiction within the field of labor-management relations depends upon whether it is seeking to apply substantive or remedial law whose formulation or application would involve weighing the same competing interests of employers, employees, labor unions, and the public among which Congress struck a balance in establishing a national legal framework for the conduct of organizational activity, collective bargaining, and labor disputes.

Cox, *Labor Law Preemption Revisited,* 85 Harv. L. Rev. at 1365.

complaint contains allegations which do not concern any arguably protected or prohibited activities. In addition, the petitioner argues that even if the Wisconsin courts might be stepping into an area of arguably protected or prohibited activities, the substantial interest Wisconsin has in regulating and remedying wrongful discharges should exempt Wisconsin courts from the effects of the preemption doctrine under the state interest exception to the *Garmon* rule.

In regard to the *Machinists* line of preemption, the petitioner argues that a congressional intention to bar states from acting in a certain area must be clearly shown. The respondents argue that NLRA sec. 14(a), 29 U.S.C. sec. 164(a), demonstrates the congressional intention to bar the state from acting in the case before this court. The petitioner, on the other hand, maintains that NLRA sec. 14(a), 29 U.S.C. sec. 164(a), refers solely to national or state laws "relating to collective bargaining" and that there was no "collective action" taken by the nurses she was attempting to get to form a united front. Therefore, the petitioner maintains that the federal statute is not applicable to the situation before this court and that this court is not preempted under the *Machinists* line of preemption.

We begin our analysis by noting that the NLRA applies to "employees" but not "supervisors." Through NLRA secs. 2(3), 2(11), and 14(a), 29 U.S.C. secs. 152(3), 152(11), and 164(a), Congress excluded supervisors from the protection afforded rank-and-file employees who engage in concerted activity for their mutual benefit. Congress's purpose was to assure management of the undivided loyalty of its supervisory personnel by making sure that no employer would have to retain as its agent one who is obligated to the union. *Florida*

53

*Power & Light Co. v. Electrical Workers,* 417 U.S. 790, 808 (1974). As such, supervisors discharged for engaging in concerted activity have no remedy under the NLRA. *See Beasley v. Food Fair of North Carolina,* 416 U.S. 653, 655–56 (1974); *Hanna Mining v. Marine Engineers,* 382 U.S. 181, 188 (1965).

As a result, when the NLRB enforces the NLRA, a threshold question is whether or not the complainant is a protected "employee" or an unprotected "supervisor."[14] With respect to NLRB jurisdictional determinations, the United States Supreme Court has stated:

> At times it has not been clear whether the particular activity regulated by the States was governed by sec. 7 or sec. 8 or was, perhaps, outside both these

---

[14]The two sections of the NLRA relevant to this issue provide:

Sec. 2(3). The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined. NLRA sec. 2(3), 29 U.S.C. sec. 152(3).

Sec. 2(11). The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. NLRA sec. 2(11), 29 U.S.C. sec. 152(11). .

> sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board.

*Garmon,* 359 U.S. at 244–45.

The NLRB has determined in this case with unclouded legal significance that the petitioner is a supervisor under the NLRA and, as such, is not entitled to protection under the NLRA for her organizational activities.[15] *Hanna Mining,* 382 U.S. at 190, citing *Garmon,* 359 U.S. at 246. *See also Beasley,* 416 U.S. at 656. Consequently, the *Garmon* line of federal labor law preemption, which was relevant at the circuit court and court of appeals levels because the NLRB had not made a determination of the status of the petitioner, has become irrelevant. The NLRA does not arguably protect the petitioner from a discharge for engaging in concerted activities nor does the NLRA arguably pro-

---

[15]The position of the administrative law judge, which was affirmed by the NLRB on August 31, 1988, is unequivocal. The administrative law judge stated, "I find that Katherine Arena, along with the other Registered Nurses at the Becker-Shoop Center, is a supervisor within the meaning of Section 2(11) of the Act, as [sic] that her discharge on October 22, 1986, did not violate the Act." The petitioner at oral argument maintained that the state court is not bound by the NLRB determination that the petitioner is a "supervisor." We disagree. If a state court were to determine independently whether or not the petitioner is a "supervisor" pursuant to state law, the potential for conflict with the federal law is obvious. To allow states to make an independent determination of a worker's status after the NLRB has determined a worker to be a "supervisor" under federal law would be inconsistent with Congress's desire to avoid conflicting rules of substantive law and remedy which ensures a consistent labor policy. *See Garmon,* 359 U.S. at 242.

hibit the respondents from discharging the petitioner based on her concerted activities.[16]

Our analysis is, therefore, narrowed to determining whether Congress, in addition to denying the protections of federal labor law to supervisors discharged for engaging in concerted activities, should be taken as also having precluded state courts under the *Machinists* line of federal labor law preemption cases from determining whether a supervisor's discharge for engaging in concerted activities was wrongful under state law. We believe that preemption of the petitioner's claim is necessary under NLRA sec.14(a), 29 U.S.C. sec. 164(a).

In *Beasley,* 416 U.S. at 657, the United States Supreme Court held that the second clause of NLRA sec. 14(a), 29 U.S.C. sec. 164(a), is a broad command that no employer shall be compelled to treat supervisors as employees for the purpose of "any law, either national or local, relating to collective bargaining." The Court noted that "'Congress' propelling intention [in promulgating sec. 14(a)] was to relieve employers from any compulsion under the Act and under state law to countenance or bargain with any union of supervisory employees.'" *Id.,* quoting *Hanna Mining,* 382 U.S. at 189. The petitioners in *Beasley* were managers of the meat departments in the respondent's stores. *Beasley,*

---

[16]We note that even though supervisors are not covered by the Act, a discharge may constitute a sec. 8(a)(1) unfair labor practice if it infringes on the sec. 7 rights of the employer's nonsupervisory employees. *See, e.g., Parker-Robb Chevrolet, Inc.,* 262 N.L.R.B. 402 (1982), *aff'd sub nom. Automobile Salesmen's Union Local 1095 v. NLRB,* 711 F.2d 383 (1983) (summarizing post–1982 standard for finding violations of the NLRA in disciplinary actions taken against supervisors). In the case before this court, however, the NLRB has determined that "there is no evidence here that the rule outlined in *Parker-Robb* would apply."

416 U.S. at 655. When Local 525 of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, organized the stores' meat cutters, the petitioners also joined the union. *Id.* The respondent discharged the petitioners, allegedly on account of their union membership, immediately after Local 525 won a representation election conducted by the NLRB. *Id.* Local 525 claimed that the discharges constituted an unfair labor practice and filed charges with the regional director of the NLRB. *Id.* The regional director refused to issue a complaint on the ground that the petitioners were "supervisors" excluded from the protection of the NLRA. *Id.* On appeal, the NLRB general counsel refused to issue a complaint on the same ground. *Id.* at 656. The petitioners then brought suit in state court against the respondent under the North Carolina right-to-work statute.[17]

The respondent in *Beasley* argued that NLRA sec. 14(a), 29 U.S.C. sec. 164(a), prohibited enforcement of the North Carolina right-to-work statute in favor of the petitioners, who were supervisors under the *Machinists*

---

[17]The relevant portion of the North Carolina right-to-work statute, N. C. Gen. Stat. secs. 95–81 and 95–83, provides as follows:

Sec. 95–81. *Nonmembership as condition of employment prohibited.*

No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment.

Sec. 95–83. *Recovery of damages by persons denied employment.*

Any person who may be denied employment or be deprived of continuation of his employment in violation of G.S. 95–80, 95–81 and 95–82 or of one or more of such sections, shall be entitled to recover from such employer and from any other person, firm, corporation, or association acting in concert with him by appropriate action in the courts of this State such damages as he may have sustained by reason of such denial or deprivation of employment.

line of federal labor law preemption. The petitioners argued that NLRA sec. 14(a) related only to the national or state laws "relating to collective bargaining" and did not bar state remedies for the discharge of supervisors for union membership, but was a limited prohibition against state regulations that compel the employer to bargain collectively with unions that include supervisors as members. The Supreme Court disagreed with the petitioners' position.

The Court held that the legislative history of NLRA sec. 41(a), read with its companion amendments, secs. 2(3) and 2(11), satisfied the Court that Congress intended to embrace laws like North Carolina's right-to-work statute within the prohibition against "any [local] law ... relating to collective bargaining." *Beasley,* 416 U.S. at 658.

> Section 2(3) of the National Labor Relations Act before the 1947 Taft-Hartley amendments provided that '[t]he term "employee" shall include any employee ....' 49 Stat. 450. The NLRB, after much vacillation, interpreted this term as including supervisors. *Packard Motor Car Co. v. NLRB,* 330 U.S. 485 (1947), sustained the Board. Congress reacted by amending § § 2(3) and 2(11), and enacting § 14(a) for the express purpose of relieving employers of obligations under the Act when supervisors, if employees under the Act, would be the focus of concern. *Hanna Mining,* [382 U.S.] at 188. Those amendments were the product of compromise of H. R. 3020 and S. 1126, 80th Cong., 1st Sess. (1947). There were differences in the specific provisions addressed to supervisory employees, but no difference in objective. Employers were not to be obliged to recognize and bargain with unions including or composed of supervisors, because supervisors were management obliged to be loyal to their employer's

interests, and their identity with the interests of rank-and-file employees might impair that loyalty and threaten realization of the basic ends of federal labor legislation. Thus the House Report stated:

> '*Management, like labor, must have faithful agents.*—If we are to produce goods competitively and in such large quantities that many can buy them at low cost, then, just as there are people on labor's side to say what workers want and have a right to expect, there must be in management and loyal to it persons not subject to influence or control of unions, not only to assign people to their work, to see that they keep at their work and do it well, to correct them when they are at fault, and to settle their complaints and grievances, but to determine how much work employees should do, what pay they should receive for it, and to carry on the whole of labor relations.' H. R. Rep. No. 245, 80th Cong., 1st Sess., 16 (1947).

Further:

> 'The bill does not forbid anyone to organize. It does not forbid any employer to recognize a union of foremen. Employers who, in the past, have bargained collectively with supervisors may continue to do so. What the bill does is to say what the law always has said until the Labor Board, in the exercise of what it modestly calls its "expertness," changed the law: That no one, whether employer or employee, need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust.' *Id.,* at 17 (emphasis in original).

59

The same theme—that unionizing supervisors threatened realization of the basic objectives of the Act to increase the output of goods in commerce by promoting labor peace—is repeated in the Senate Report. The Report refers to the NLRB rulings that included supervisors as protected employees as

> '[a] recent development which probably more than any other single factor has upset any real balance of power in the collective-bargaining process ....
>
> 'The folly of permitting a continuation of this policy is dramatically illustrated by what has happened in the captive mines of the Jones & Laughlin Steel Corp. since supervisory employees were organized by the United Mine Workers under the protection of the act. Disciplinary slips issued by the underground supervisors in these mines have fallen off by two-thirds and the accident rate in each mine has doubled.' S. Rep. No. 105, 80th Cong., 1st Sess. 3, 4 (1947).

This history compels the conclusion that Congress' dominant purpose in amending § § 2(3) and 2(11), and enacting § 14(a) was to redress a perceived imbalance in labor-management relationships that was found to arise from putting supervisors in the position of serving two masters with opposed interests. See generally *NLRB v. Bell Aerospace Co.,* [416 U.S. 267 (1974)]. We conclude, therefore, that the second clause of § 14(a) relieving the employer of obligations under 'any law either national or local, relating to collective bargaining' applies to any law that requires an employer 'to accord to the front line of management the anomalous status of employees.' S. Rep. No. 105, *supra,* at 5. Enforcement against respondents in this case of

60

> [the North Carolina right-to-work statute] would plainly put pressure on respondents 'to accord to the front line of management the anomalous status of employees,' and would therefore flout the national policy against compulsion upon employers from either federal or state agencies to treat supervisors as employees. Cf. *Teamsters Union v. Morton*, 377 U.S. 252, 258–260 (1964).

*Id.* at 658–62 (footnotes omitted).

In the case before this court, the petitioner alleges that she was discharged as a result of her activities to form an organization or association to represent the collective interests of the nurses at Becker-Shoop Center. The petitioner further alleges that the respondents, in concert with others, decided to terminate the petitioner because of a concern about the petitioner's organizational activities, and such concerted activities on the part of the respondents and others were contrary to secs. 133.03 and 134.01, Stats. In addition, the petitioner alleged that her termination was wrongful and contrary to secs. 134.01, 133.03, 103.51, 111.04, and 111.06(1)(a), (b), (c), and (2), Stats.

We agree with the circuit court's conclusion that the "gravamen" of the petitioner's complaint is that she was terminated because of her activities in attempting to form an organization or association to represent the collective interests of the nurses at the Becker-Shoop Center. The petitioner's organizational activities are not protected by the NLRA because the NLRB determined that the petitioner was a "supervisor." *Beasley*, 416 U.S. at 655–56; *Hanna Mining*, 382 U.S. at 188. We hold that if this court were to recognize a cause of action for a violation of secs. 133.03 and 134.01, Stats., or for wrongful discharge under Wisconsin law on the facts

alleged in the petitioner's complaint, we would frustrate the Congressional purpose embodied in NLRA sec. 14(a), 29 U.S.C. sec. 164(a), to relieve the employer of any obligation "to accord to the front line of management the anomalous status of employees."[18] *Beasley,* 416 U.S. at 662. Enforcement of secs. 133.03 and 134.01, or a recognition of a cause of action for wrongful discharge under Wisconsin law by this court in this case would plainly put pressure on the respondents "to accord to the front line of management the anomalous status of employees" and would, therefore, flout the national policy against compulsion upon employers from either federal or state agencies to treat supervisors as employees. We believe that the legislative history of NLRA sec. 14(a), read with its companion amendments, secs. 2(3) and 2(11), demonstrates that Congress intended to embrace laws like secs. 133.03 and 134.01 and common law causes of action for wrongful discharge, when invoked in a situation similar to the one alleged in the petitioner's complaint, within the prohibition against any local law "relating to collective bargaining." As the United States Supreme Court has held, "The availability or not of economic weapons that federal law leaves the parties free to use cannot 'depend upon the forum in which the [opponent] presses its claims.'" *Machinists,* 427 U.S. at 153, quoting in part *Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 256 (1974). Consequently, we conclude that the petitioner's cause of action for an alleged violation of secs. 133.03 and 134.01 and for wrongful discharge under Wisconsin law is preempted by the NLRA. Therefore,

[18]This is not to suggest that this court wholeheartedly endorses the congressional accommodation adopted in the NLRA in 1947, but only that we find such an accommodation in NLRA sec. 14(a), 29 U.S.C. sec. 164(a), and are bound by it.

for the reasons stated, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the Court of Appeals is affirmed.